# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROY BRADLEY LANG, III, Individually And On Behalf of All Others Similarly Situated, ) ) ) )<br><br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>VONAGE HOLDINGS CORPORATION, )<br>JEFFREY A. CITRON, MICHAEL SNYDER, )<br>SHARON A. O'LEARY, BETSY S. ATKINS, )<br>PETER BARRIS, MORTON DAVID, ORIT )<br>GADIESH, J. SANDFORD MILLER, HUGH )<br>PANERO, THOMAS J. RIDGE, JOHN J. )<br>ROBERTS, HARRY WELLER, CITIGROUP, )<br>GLOBAL MARKETS, INC., DEUTSCH BANK )<br>SECURITIES, INC., UBS SECURITIES, LLC, )<br>BEAR STEARNS & CO., INC., PIPER )<br>JAFFRAY & CO., and THOMAS WEISEL )<br>PARTNERS, INC. )<br>)<br>Defendants. ) | CIVIL ACTION NO. _____<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

This is a federal class action on behalf of those investors who purchased or otherwise acquired the common stock of Vonage Holdings Corp. ("Vonage" or the "Company") pursuant to or traceable to the Company's May 24, 2006, $31.25 million share Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). As alleged herein, in connection with the May 2006 IPO, defendants published a joint Registration Statement and Proxy-Prospectus (the "Prospectus") that was materially false and misleading at the time of such Offering, and that omitted to reveal material

information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## OVERVIEW

1.      According to the Company's profile, Vonage provides broadband telephone services in the United States, Canada and the United Kingdom, primarily using voice over Internet protocol (VoIP) technology. The Company's service and technologies purport to allow monthly subscribers to conduct voice communications over the Internet, through the conversion and compression of voice signals into data packets. As of February 8, 2006, the Company claimed to have approximately 1.4 million subscriber lines.

2.      Prior to the time of the May 2006 IPO, however, to generate subscriber growth, Vonage had racked up massive marketing expenses and over $467.4 million of accumulated deficit. In fact, during 2005 alone, the Company spent over $250 million, and during the first quarter of 2006 Vonage spent $88.3 million on marketing -- up 59% from the period a year earlier. At the time of the Offering, Vonage had lost nearly half a billion dollars from its inception -- with more than 25% of that loss coming in the last three months alone, Moreover, at the time of the IPO, Vonage also had $250 million in debt and no clear plan for profitability.

3.      In addition to the foregoing, also prior to the inception of the Class Period, Vonage had been described in the financial press as "a wildly unprofitable company." At that time, even if Vonage managed to sustain its customer growth without spending any money on marketing, the Company was still losing money with its $269 million in gross revenues failing to cover the $290 million in operating expenses, ex-marketing. Moreover, subtract out the $279 in marketing spent per net customer added in 2005, and the Company still couldn't keep the lights on.

4.      Despite the foregoing, by the inception of the May 2006 IPO, Company insiders, including defendant Citron, the Company's Chairman and largest individual shareholder, had invested an aggregate of over $450.5 million of their personal funds in Vonage.  Yet, with no public market, and with the Company's primary service quickly becoming a very low priced commodity, by the spring of 2006, Company insiders were desperate to execute an exit strategy for themselves.  To accomplish this, defendants needed to create a public market for Company shares -- one in which they too would be able to ultimately sell millions of shares of Vonage stock. [1]

5.      Moreover, as a result of the problems inherent in the Company at the time of the Offering, institutional investors that would normally commit to buying large blocks of shares in an initial public offering prior to such offering, could not be relied upon to commit to a Vonage Offering priced between $16.00 and $18.00 per share.  In fact, at the time of the Vonage IPO, at least one analyst valued the Company's shares at no more than $10.00.  Thus, because Vonage's service is delivered through the broadband connections controlled by cable or phone operators, the Company is limited in the kinds of new services it can roll out, and Vonage maintains no sustainable advantage over cable in VOIP.

6.      Thus, to stimulate demand for the Company's IPO, defendants embarked on a scheme and illegal course of conduct, the purpose and effect of which was to load up Vonage customers with Company shares and to create artificial demand for Company stock prior to and in the Offering.   To accomplish this, Vonage pre-sold at least 13.5% of its IPO shares to Company customers -- through what it described as its Directed Share Program.

_____

[1] The other alternative would have been to find a private buyer.  By May 2006, however, it was virtually impossible to find a buyer that would either have given defendants $550 million in cash, or which would be willing to value Vonage at its post IPO $2.1 billion market-cap.

7.     To participate in the Vonage Customer Directed Share Program, customers were required to open a "limited purpose brokerage account" at one of its underwriters' brokerage houses.  Vonage customers were then able to request up to 5,000 shares of the Company -- valued at up to $85,000 at the Offering price --  provided only that they satisfied the following conditions: (i) the customer opened an account directly with Vonage America on, or prior to, December 15, 2005; (ii) the customer's Vonage account had to be in good standing through February 1, 2006; (iii) the customer must be a U.S. citizen; and (iv) the customer must be a natural person residing in the United States at the time of the Offering.

8.      Unbeknownst to the public investors who purchased shares in the Vonage IPO, in racing to create a public market for shares of the Company before its core technology and services became virtually worthless, and before insiders lost their half billion dollar investment, defendants had improperly stuffed customer accounts full of IPO shares, despite the fact that theses share allocations were not appropriate for certain investors, and despite the fact that defendants had failed to abide by NASD Rule 2310 in connection with the sale of Company shares to Vonage customers through the Directed Share Program.

9.     NASD Rule 2310 clearly states that, "in recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and his financial situation and needs."  This includes an analysis of: (i) a customer's financial status; a customer's tax status; a customer's investment objectives; and (iv) such other information used or considered to be reasonable by such a member or registered representative in making recommendations to that customer.

4

10. Thus, Company insiders violated NASD Rule 2310, because it allowed them to cram investors into the Vonage IPO regardless of their suitability. Under the unique circumstances of the Vonage IPO, the Underwriter Defendants were also motivated to let this illegal and improper action continue. In fact, in addition to receiving almost $40 million in gross fees in connection with the Vonage IPO, the Underwriter Defendants had also negotiated for, and received, full indemnification for any risk of non-payment by customers in the Directed Share Program. Thus, the Underwriter Defendants had little or no incentive, and exercised less care, in insuring that Program participants were suitable for the allocation of shares that were being placed into their accounts by Vonage.

11. What the Underwriter Defendants ignored, however, was that because they were also acting as underwriters in the Offering, in addition to administrators of the Directed Share accounts, and because they had taken substantial underwriting fees from investors, they were responsible for ensuring that Vonage had complied with NASD Rule 2310 in setting up and administering these customer accounts.

12. A direct result of defendants' failure to assure that the allocation of Vonage shares was suitable for the investors to which they were allocated -- which it appears they were not -- shares of Vonage sold in the IPO declined over 30% in its first seven trading days. The decline in the value of these shares has been substantially exacerbated by many Vonage customers who participated in the Directed Share Program and now refuse to pay for their shares.

13. Thus, because defendants had failed to screen those who were allocated Company shares in the IPO in accordance with NASD Rule 2310, the immediate backlash by those customers who were allocated such shares who did not understand their duties, who lacked the financial wherewithal to pay for such declining valued stock, or simply failed to perform in

5

accordance with allocation Program, was severe. Worse yet, in order to now collect for the losses related to the allocation of Vonage shares to customer accounts, defendants have to risk alienating and losing these already unhappy customers.

14. By June 1, 2006, as defendants' statement regarding their intention to pursue Vonage customers for full payment of the Vonage shares allocated to them in the Offering circulated in the market, shares of the Company traded to a low of $11.52 per share before closing the day at $11.63 per share. At that time too, horror stories also began to surface, told by Directed Share Program participants who had attempted to verify their allocations and/or protect or liquidate their positions, but who could not obtain brokerage services and who could not use non-functioning automated account services.

15. The cumulative effects of defendants' illegal and improper actions have decimated the price of Company shares following the Offering. As shares declined almost $6.50 each, in only seven trading days, investors saw almost $200 million, or over 30% of their investment in the Company, eviscerated.

## JURISDICTION AND VENUE

16. Jurisdiction is conferred by § 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v. The claims asserted herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act, §§ 77k and 77o, and rules promulgated thereunder by the Securities and Exchange Commission (the "SEC").

17. Venue is proper in this District pursuant to § 22 of the Securities Act. Defendant Vonage maintains its principal place of business within this District, and/or the Individual Defendants conduct business in, and many of the acts giving rise to the violations complained of herein, took place in this District.

18.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff **ROY BRADLEY LANG, III,** as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Vonage at artificially inflated prices during the Class Period and has been damaged thereby.

### Corporate & Individual Defendants

20.     Defendant **VONAGE HOLDINGS CORPORATION** is a Delaware corporation with its principal place of business and chief executive offices located at 23 Main Street Holmdel, NJ 07733.   According to the Company's profile, Vonage provides broadband telephone services primarily in the United States, Canada, and the United Kingdom, primarily using voice over Internet protocol technology.  The Company's service and technologies purport to allow monthly subscribers to conduct voice communications over the Internet through the conversion and compression of voice signals into data packets.   The Company provides broadband telephone services to customers through various service plans, each of which has a fixed monthly fee.  As of February 8, 2006, the Company claimed to have approximately 1.4 million subscriber lines.

21.     Defendant **JEFFREY A. CITRON** ("Citron") was, at the time of the IPO, Chairman and "Chief Strategist" of the Company.  In preparation for the IPO, defendant Citron resigned as Chief Executive Officer, a position he held from January 2001 through February 2006.  In addition to founding Island ECN, an electronic order execution trading system, in 1995,

defendant Citron also served as Chairman and CEO of Datek Online Holdings Corp. ("Datek") from 1995 to 1999. Following the IPO, defendant Citron owned approximately 33% of the Company's common stock issued and outstanding, or 48.427 million shares, the majority of which were acquired through the exercise of low priced options, and many of which were subject to 180-day lock-up provisions that prevented their immediate sale at the time of the Offering. Defendant Citron was responsible for the preparation, filing and dissemination of the materially false and misleading Prospectus issued in connection with the Vonage IPO.

22.     Defendant **MICHAEL SNYDER** ("Snyder") was, at the time of the IPO, Chief Executive Officer and a member of the Board of Directors of the Company. Defendant Snyder joined the Company in February 2006, primarily to oversee and conduct the May 2006 IPO. Defendant Snyder was responsible for the preparation, filing and dissemination of the materially false and misleading Prospectus issued in connection with the Vonage IPO.

23.     Defendant **SHARON A. O'LEARY** ("O'Leary") was, at the time of the IPO, Executive Vice President and Chief Legal Officer of the Company. Defendant O'Leary was instrumental in the design and implementation of the Directed Share Program, made in connection with the May Offering. Accordingly, defendant O'Leary was also responsible for the preparation, filing and dissemination of the materially false and misleading Prospectus issued in connection with the Vonage IPO.

24.     The following individuals served as members of the Board of Directors of the Company at the time of the May Offering:

> **BETSY S. ATKINS**          ("Atkins")
>
> **PETER BARRIS**             ("Barris")
>
> **MORTON DAVID**             ("David")

| | |
|---|---|
| **ORIT GADIESH** | ("Gadiesh") |
| **J. SANFORD MILLER\*\*** | ("Miller") |
| **HUGH PANERO** | ("Panero") |
| **THOMAS J. RIDGE** | ("Ridge") |
| **JOHN J. ROBERTS** | ("Roberts") |
| **HARRY WELLER** | ("Weller") |

\*\*    According to the Company's Offering Prospectus, defendant Miller is a co-founder and shareholder of Thomas Weisel Partners, one of the Underwriters of the Offering.

25.    The defendants referenced above in ¶¶ 21 - 24 are referred to herein as the "Individual Defendants."

**IPO Underwriter Defendants**

26.    In connection with the May 2006 Initial Public Offering, the following investment banks acted as "lead underwriters" of the Offering and distributed millions of shares of Vonage stock in the open markets, as follows:

| Underwriter | Number of Shares |
|---|---|
| Citigroup Global Markets Inc.\*\*  ("Citigroup") | 7,031,250 |
| Deutsche Bank Securities Inc. \*\* ("Deutsche Bank") | 7,031,250 |
| UBS Securities LLC \*\*  ("UBS Securities") | 7,031,250 |
| Bear, Stearns & Co. Inc. | 5,312,500 |
| Piper Jaffray & Co. | 2,421,875 |
| Thomas Weisel Partners LLC | 2,421,875 |
| **Total** | **31,250,000** |

* *     Defendants Citigroup, Deutsche Bank and UBS Securities each acted as placement agents in connection with the private placement of Vonage's convertible notes in December 2005.

27.     In connection with the May 2006 IPO the Underwriter Defendants collectively received fees of over $31.875 million.  In addition, in connection with the IPO, an affiliate of Citigroup Global Markets Inc., also received additional compensation valued at over $6.071 million.  Citigroup received this additional consideration as a result of the conversion of convertible notes held by a Citigroup affiliate.  In connection with the Offering, based on the initial public offering price of $17.00 per share, these convertible notes were converted into 1.069 million shares of Vonage common stock immediately following the completion of the Offering.

28.     Investors were willing to and did pay these large underwriting fees  -- *that accounted for 17% of the purchase price of the shares sold in the Offering* -- and did not question the millions of dollars in additional compensation realized by the affiliate of defendant Citigroup in connection with the Offering, because investors believed that such fees were being paid, in substantial part, to assure that the underwriters had conducted a thorough analysis of the transaction -- commonly referred to as a *"due diligence" investigation.*

29.     A due diligence investigation goes well beyond a casual investigation of the Company and its operations.  A due diligence investigation is a time-consuming, expensive and laborious task -- if executed with serious intention -- and it is designed to test the integrity of a transaction, and to assure that an offering is conducted in accordance with state and federal law. It is for these reasons that investors were willing to pay almost $40 million to the Underwriter Defendants in connection with the Vonage IPO.

10

30.     Moreover, due to the specific, unique facts and circumstances surrounding the Vonage IPO, investors were especially concerned that the Underwriters' due diligence investigation be carried out with extreme caution and attention.  This enhanced level of critical review was necessary and proper here because, according to the Company's Offering Prospectus, defendant Citron had ***already*** paid a $22.5 million in civil penalties -- among the largest fines ever collected by the U.S. SEC against an individual -- and had agreed to accept a consent order that permanently barred him from associating with any securities dealers or brokers, as a result of his prior actions as a member of Datek.

31.     The settlement related to defendant Citron's prior alleged illegal and improper activities at Datek, and were described as follows:

**INFORMATION CONCERNING OUR FOUNDER, CHAIRMAN AND CHIEF STRATEGIST**

**Past SEC actions against Mr. Citron and others**.  Prior to joining Vonage, Mr. Citron was associated with Datek Securities Corporation and Datek Online Holdings Corp., including as an employee of, and consultant for, Datek Securities and, later, as one of the principal executive officers and largest stockholders of Datek Online. Mr. Citron originally joined Datek Securities in 1989 at the age of 18 at the invitation of Sheldon Maschler (another principal executive officer and large stockholder of Datek and long-time friend of Mr. Citron's family). Datek Online, which was formed in early 1998 following a reorganization of the Datek business, was a large online brokerage firm. Datek Securities was a registered broker-dealer that engaged in a number of businesses, including proprietary trading and order execution services***. During a portion of the time that Mr. Citron was associated with Datek Securities, the SEC alleged that Datek Securities, Mr. Maschler, Mr. Citron and certain other individuals participated in an extensive fraudulent scheme involving improper use of the Nasdaq Stock Market's Small Order Execution System, or SOES***. In January 2003, Mr. Maschler, Mr. Citron and others entered into settlement agreements with the SEC to resolve charges that they had improperly used SOES from 1993 until early 1998, when Datek Securities' day-trading operations were sold to Heartland Securities Corporation. Mr. Maschler and others, but not Mr. Citron, were alleged to have continued such improper use until June 2001 at Heartland Securities. SOES, an automated trading system, was restricted by NASD rules to individual customers, and brokerage firms such as Datek Securities were prohibited from using SOES to trade for their own accounts. ***The SEC alleged that Mr. Citron***

*and the other defendants accessed the SOES system to execute millions of unlawful proprietary trades, generating tens of millions of dollars in illegal profits*. The complaint further alleged that these defendants hid their fraudulent use of the SOES system from regulators by allocating the trades to dozens of nominee accounts, creating fictitious books and records, and filing false reports with the SEC. *To settle the charges, Mr. Maschler, Mr. Citron and the other individuals paid $70 million in civil penalties and disgorgements of profits, of which Mr. Citron paid $22.5 million in civil penalties. These fines were among the largest fines ever collected by the SEC against individuals. In addition, Mr. Citron was enjoined from future violations of certain provisions of the U.S. securities laws, including the antifraud provisions set forth in Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under the Exchange Act. Mr. Citron also agreed to accept an SEC order that permanently bars him from association with any securities broker or dealer. Mr. Maschler and the other individuals and corporations agreed to similar restrictions*. Mr. Citron settled theses charges without admitting or denying the allegations in the SEC's complaint. The SEC reached a separate settlement with Datek Securities (through its successor iCapital Markets LLC) in January 2002, which resulted in a censure and a civil penalty of $6.3 million.

**Past NASD disciplinary action.**  In 1994, Datek Securities, Mr. Maschler, Mr. *Citron and others associated with Datek Securities were the subject of an administrative complaint by the NASD for violating NASD rules governing SOES between November 1991 and February 1993*. The complaint also alleged improper supervision of subordinates responsible for entry of SOES orders. Datek Securities, Mr. Citron and the other individuals settled the charges in January 1997. *Pursuant to the settlement, Mr. Citron paid a fine of $20,000 and was suspended from any association (other than as a computer consultant) with Datek Securities for 20 days*.

**Past association with Robert E. Brennan**.    During the late 1990s, Mr. Citron was an acquaintance of Robert E. Brennan, having been introduced to Brennan by Mr. Maschler in 1996. In that year, Mr. Citron purchased real estate and an airplane from entities associated with Brennan. Mr. Citron also socialized with Brennan and vacationed with Brennan in early 1999. Brennan previously owned First Jersey Securities, a securities brokerage firm that ceased doing business in 1985 after civil actions were brought by the SEC**. *In 1995, Brennan was fined $75.0 million by the SEC for massive securities fraud, including fraud relating to penny stock sales by First Jersey Securities. Brennan also was permanently barred from the securities business and enjoined from violations of the U.S. securities laws. In 2002, Brennan was convicted of bankruptcy fraud, money laundering, and obstruction of justice and was sentenced to a total of 12 years in federal prison*… [Emphasis added.]

32.     It was, in part, because of the questionable history of defendant Citron, that investors were willing to pay high underwriting fees, so as to assure that the Underwriters were able to conduct an adequate due diligence investigation commensurate with the facts and circumstances of the Vonage IPO.   In addition, many investors were also willing to pay this premium to provide assurance that the "exotic" nature of this Offering did not violate federal or state securities laws.

33.     The Vonage IPO was described by certain market commentators as unique or exotic because, in connection with the Offering, defendants reserved approximately 13.5% of the Company's IPO shares, or over 421,800 shares, to be sold to actual customers and users of the Vonage telephone service.  The Company's "Directed Share Program" was described, in part, as follows:

**Directed Share Programs**

We have requested that the underwriters reserve up to 13.5% of the common stock offered in this prospectus for sale to certain of our customers at the initial public offering price in the Vonage Customer Directed Share Program.  The Vonage Customer Directed Share Program will be centrally administered through the program website at ipoinfo.vonage.com. *A Vonage customer may be eligible to participate in the Vonage Customer Directed Share Program if he or she meets all of the following criteria:*

*       The customer opened an account directly with Vonage America on or *prior to December 15, 2005*. The customer must have opened an account with Vonage America and not through a third-party wholesaler.

*       The customer maintained the *Vonage account in good standing* through February 1, 2006.

*       The customer is a *U.S. citizen.*

*       The customer *resides in the United States* as of the date of the consummation of this offering.

*       The customer is *a natural person* and has a valid U.S. social security number. No entities are eligible to participate.

13

*In order to participate in the Vonage Customer Directed Share Program, the customer also must open a limited purpose brokerage account at either Smith Barney, a division of Citigroup Global Markets Inc., Deutsche Bank Alex. Brown, a division of Deutsche Bank Securities Inc., or UBS Financial Services Inc.* Eligible customers will be permitted to purchase shares of our common stock in the Vonage Customer Directed Share Program only through a limited purpose brokerage account at one of these financial institutions.

Other conditions to participation also may apply.

*Eligible customers who choose to participate in the Vonage Customer Directed Share Program must submit conditional offers to purchase at least 100 and no more than 5,000 shares*. In the event that eligible customers submit valid conditional offers for more shares than have been reserved for allocation in the Vonage Customer Directed Share Program, *we will allocate shares for purchase by eligible customers as follows:*

1.      We will first attempt to allocate shares to all customers who submitted a valid conditional offer by reducing each customer's conditional offer by a percentage and allocating shares to each customer in the amount of his or her reduced conditional offer.

*       Each customer's conditional offer will be reduced by the same percentage, rounded up to the nearest 100 shares. No conditional offer will be reduced, however, to below 100 shares as a result of this pro rata reduction.

*       We will reduce the conditional offers by the lowest percentage that will allow all conditional offers, as reduced and after rounding, to be filled. We will not, however, apply a pro rata reduction that exceeds 75%.

*In the event that not all of the conditional offers*, as reduced by 75% and after rounding, can be filled, *the following allocation model will be used:*

•       Conditional offers, as reduced by 75% and after rounding, will be filled in size order, with the largest conditional offers filled first. For example, any conditional offers for 5,000 shares would be reduced by 75% and rounded up to the nearest 100 shares, resulting in conditional offers for 1,300 shares. Each of these conditional offers would be filled with 1,300 shares prior to filling any conditional offers for fewer shares.

•       In the event that not all of the conditional offers of a particular size can be filled, but there remain shares available for allocation, conditional offers will be filled within the particular size by lottery. [Emphasis added.]

14

34.     Thus, investors were willing to and did pay the large underwriting fees and costs to Underwriter Defendants to assure that the Company's unique Directed Share Program was conducted in accordance with the law.  Moreover, because Vonage customers were required to open a limited purpose brokerage account at either Smith Barney, a division of Citigroup Global Markets Inc., Deutsche Bank Alex. Brown, a division of Deutsche Bank Securities Inc., or UBS Financial Services Inc., and because eligible customers were permitted to purchase shares of Vonage common stock in the Directed Share Program *only* through a limited purpose brokerage account at one of these financial institutions, investors further believed that the Underwriter Defendants had control and oversight over this Program.  In addition, investors also believed that the Underwriter Defendants had conducted an adequate due diligence review of each facet of the Offering.

35.     The Underwriter Defendants were also aware, or should have been aware, of the fact that Vonage had agreed to indemnify the Underwriters against certain liabilities relating to the Directed Share Program.  This indemnification also made strict compliance with all state and federal offering rules, as well as client brokerage rules, of the highest importance to investors. These liabilities included the foreseeable possibility that participants in the Directed Share Program would refuse or fail to pay for the common stock allocated them in the Offering.

36.     Moreover, in addition to the Underwriter Defendants, because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance

15

at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

37.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Vonage, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

38.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded

common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

39. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Vonage, each of the Individual Defendants had access to the adverse undisclosed information about Vonage's business prospects and financial condition and performance as particularized herein and knew (or recklessly or negligently disregarded) that these adverse facts rendered the positive representations made by or about Vonage and its business issued or adopted by the Company materially false and misleading.

40. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Vonage pursuant to or traceable to the Company's May 24, 2006 Initial Public Offering (the "Class"), and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  In connection with the May 2006 IPO over 31.2 million Vonage shares were sold to the public and in the days immediately following this Offering, tens of millions of shares traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vonage or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Vonage; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Vonage Initial Public Offering

47.     Prior to the May 2006 IPO, Vonage was a company that had obtained significant near-term subscriber growth, but was also a company that was running a huge reported deficit and a company that was not achieving profitability as a result of its extremely high marketing costs and build-out expenses.  These facts were well known to the investing community and, in

fact, the Prospectus itself described the Company's pre-Offering financial and operational condition, in part, as follows:

> ***For the period from our inception through March 31, 2006, our accumulated deficit was $467.4 million. Our quarterly net losses generally have increased each quarter from our inception through the quarter ended March 31, 2006, for which our net loss was $85.2 million***. Initially, our net losses were driven principally by start-up costs and the costs of developing our technology. More recently, our net losses have been driven principally by marketing expense, which was $88.3 million for the three months ended March 31, 2006. ***In order to grow our revenue and customer base, we have chosen to increase our marketing expenditures significantly. We are pursuing growth, rather than profitability, in the near term to capitalize on the current expansion of the broadband and VoIP markets and enhance the future value of our company***…. We intend to continue to increase our marketing expense, and we may continue to generate net losses for the foreseeable future… [Emphasis added.]

48.     In addition to the foregoing, at or about the time of the IPO, market commentators and analysts also made the following observations about the Company's precarious financial underpinnings, including in part, that:

\*      At the time of the Offering, Vonage was "a wildly unprofitable company" still selling at a very high premium.

\*      At the time of the Vonage IPO, market conditions made it very difficult for a speculative Internet company, one sacrificing profits to fuel growth, to raise a half a billion dollars through an IPO.

\*      During 1Q:F06, the period ended March 2006, Vonage managed to accumulate 1.6 million users and booked $119 million in revenue.  However, to maintain top line growth, Vonage needed to spend a lot more money.

\*      At the time of the May 2006 IPO, Vonage had racked up massive marketing expenses in an effort to maintain customer growth and acquisitions. The Company spent a quarter billion dollars on marketing in 2005 and during the first quarter 2006 Vonage spent $88.3 million on marketing -- up 59% from a year earlier

\*      At the time of the Offering, Vonage had lost nearly half a billion dollars from its inception -- with more than 25% of that coming in the last three months alone -- had $250 million in debt, and had no clear plan for profitability.

* At the time of the IPO, even if Vonage managed to sustain its customer growth without spending a penny on marketing, the Company was still losing money, with its $269 million in gross revenues failing to cover the $290 million in operating expenses ex-marketing; subtract out the $279 in marketing spent per net customer added in 2005 and the company still can't keep the lights on.

49. In addition to the specific business issues related to the Company's cost and expense structure, at the time of the IPO, analysts and market commentators were also critical of the Company's entire plan and business model. In this regard, at or about the time of the IPO, the financial press also reported, in part, the following:

**Reuters : May 24, 2006**
Vonage has acknowledged it may never be profitable and is viewed with skepticism by many analysts, who cite the growing competition it faces in providing voice-over-Internet protocol (VoIP) services. ***"It's very hard to see what their competitive advantage is,"*** said Richard Greenfield, an analyst at Pali Research. "***We basically believed, pre-IPO, that the price should be $10 or less."***

**TheStreet.com : May 24, 2006**
"Vonage is a ride-along service" using other companies' broadband connections to deliver calls, says one telecom investor who is not buying the initial offering. ***"There is no sustainable advantage as cable rolls out VoIP."*** …Indeed, Vonage's appeal to investors has been waning as more players rush to offer VoIP services. Between low-cost calling plans from cable companies and telcos, and the fast-growing appeal of free phone service from outfits like eBay's Skype, ***Vonage faces a formidable cast of challengers.***

**FORTUNE Magazine: May 24, 2006**
***Because Vonage's service rides on the broadband connections controlled by cable or phone operators, it is somewhat limited in the kinds of new services it can roll out***. The cable operators, for example, have been offering faster speeds over the cable modem connection for an extra monthly fee. Vonage wouldn't be able to offer that kind of premium service to its subscribers because it doesn't control the pipeline to the customer…. And as for selling other services, such as cable-television or wireless phone service, sure ***Vonage could resell another providers' offer, but reselling is a pretty low margin business.***

**FORBES.com: May 24, 2006**
Vonage specializes in voice-over-Internet Protocol technology, which makes it possible to receive and send phone calls through an Internet connection. ***Eventually, the pricing for such technology will drop to nil,*** [Todd Rothemeier, an analyst at Soleil Securities/Sur Terre Research] says, as competition forces a

price war. "***They will have to radically change their business model***," he says. [Emphasis added.]

50.     It is against this background, therefore, that defendants adopted a very unique offering strategy to generate interest in and support for the Vonage IPO.  Thus, pursuant to the Offering, defendants reserved approximately 13.5% of the IPO shares, to be sold to Company customers through a Directed Share Program.  This program allowed defendants to create substantial additional demand for shares of Vonage stock prior to the Offering because, pursuant to this Program, prior to the IPO, defendants solicited customers *via* email and voicemail to express an interest and request an allotment in Offering shares.

51.     Moreover, because defendants also assisted in the creation and management of customer accounts, through several of the Underwriter Defendants, and because customers were allocated IPO shares without having any money in such accounts, shareholders could very easily participate in the Offering.[2]  Eliminating barriers to participating in the Offering allowed and encouraged Company customers to pre-request Vonage IPO shares.

52.     In fact, however, some analysts and market commentators viewed the ease at which Vonage customers could reserve up to 5,000 shares of IPO stock, at a cost of almost $85,000.00, as an artificial mechanism through which defendants had propped up the Offering itself.  In fact, former Morgan Stanley technology analyst, Henry Blodget was publicly quoted immediately after the Vonage IPO as stating that, "given the difficulty Vonage had generating institutional demand for its IPO (witness the tanking stock), a cynic might suggest that the apparently customer-friendly IPO gesture was actually just a savvy capital-raising move."

---

[2] According to an email sent to Directed Share Program participants, later filed with the SEC, Filed May 25, 2006, those allocated shares of Vonage common stock for purchase in the Vonage Customer Directed Share Program were given until May 30, 2006 to make full payment such shares.

**Defendants' Materially False and Misleading
Statements Made In the Registration Statement or Prospectus**

53.     Savvy marketing or not, what investors could not know at the time of the IPO was that defendants had sold over 31.25 million shares of common stock pursuant to a materially false and misleading Registration Statement and Proxy-Prospectus, that failed to reveal that defendants had improperly and illegally sold over 13.5% of the IPO to its customers in violation of NASD rules.  Thus, while investors relied on the close-knit relationship between Underwriters and the Company, and while they also relied upon the Underwriter Defendants to conduct an effective and adequate due diligence review that would have prevented the illegal and improper sales of Vonage shares in the Directed Share Program, in fact, the administration of the  Directed Share Program violated these rules.

54.     As investors have now learned, in connection with the May 2006 IPO, defendants utterly failed to comply with NASD Rule 2310, and appear to have engaged in the wholesale violation of this important rule.  As investors have now learned, Vonage, UBS, Citigroup Smith Barney and Deutsche Bank, collectively, appear to have violated NASD Rule 2310 up to 12,000 times!   NASD Rule 2310, prohibiting unsuitable investments, states the following:

**The Rules Governing Unsuitable Investments**

-NASD Rule-

NASD Rule 2310 provides the framework for suitability claims against financial professionals:

(a)     ***In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer*** upon the basis of the facts, if any, disclosed by such customer as to his other security holdings ***and his financial situation and needs.***

23

(b)     Prior to the execution of a transaction recommended to a non-institutional customer…a member shall make reasonable efforts to obtain information concerning:

    (1)     The *customer's financial status*;

    (2)     The *customer's tax status*;

    (3)     The customer's *investment objectives*; and

    (4)     *Such other information used or considered to be reasonable by such a member or registered representative* in making recommendations to the customer. [Emphasis added.]

55.     As Vonage investors learned after the completion of the IPO as Company shares debuted to one of the worst initial performances in the recent history of the New York Stock Exchange, defendants had failed to assure that the shares distributed pursuant to the Directed Share Program were allocated to those for whom such investments would be deemed suitable or proper under the NASD rules.  In fact, as investors ultimately realized, it was because many of the participants in the Directed Share Program lacked suitability, that the Vonage IPO has performed well below expectations, and has resulted in the evisceration of almost $170 million of Vonage investors' market capitalization in only one week of trading.

56.     The fact that defendants violated NASD Rule 2310 is evident from both a review of the IPO Prospectus, and from an examination of the circumstances that have arisen immediately following the Vonage Offering.  First, it is obvious from a review of the Offering Prospectus that nothing more was required of Vonage customers to receive up to 5,000 shares of Vonage stock than an email request, and the opening of an account with either Smith Barney, Deutsche Bank Alex. Brown or UBS Financial.  While shares were purported to be provided only to Vonage customers whose phone accounts were in good standing, opened prior to December 15, 2005 and who were U.S. citizens, nothing in the IPO Prospectus begins to

document any request for information that even approximates : (i) the customer's financial status; (ii) the customer's tax status; (iii) the customer's investment objectives; and/or (iv) such other information used or considered to be reasonable by such a member or registered representative in making recommendations to the customer.

57.     Moreover, because the Underwriter Defendants negotiated to receive full indemnity for any risk of non-payment by customers in the Directed Share Program, they had little incentive and exercised less care in insuring that Program participants were suitable for the allocation of shares that were being placed into their accounts by Vonage.  What the Underwriter Defendants ignored, however, was that because they were also acting as underwriters in the Offering, in addition to administrators of the Directed Share accounts, and because they had taken substantial underwriting fees from investors, they were also responsible for ensuring that Vonage had complied with NASD Rule 2310 in setting up and administering these customer accounts.

58.     In addition to conspicuously detailing defendants' failure to comply with NASD Rule 2310 in the IPO Prospectus, this failure was also immediately apparent from the facts and circumstances that occurred immediately after the Offering -- as many of the non-suitable investors immediately raced to the market to liquidate, or flip, the share that had been allocated by Vonage, or as they otherwise immediately failed to perform their obligation to pay for such shares.  This only became more apparent as the price of Vonage shares collapsed immediately following the Offering.

59.     A direct result of defendants' failure to assure that the allocation of Vonage shares was suitable for the investors to which they were allocated -- which it appears they were not -- shares of Vonage sold in the IPO have now declined over 30% in as few as seven trading days.

The decline in the value of these shares has been substantially exacerbated by many Vonage customers who participated in the Directed Share Program refusal to pay for their shares.

60. Thus, because defendants had failed to screen those who were allocated Company shares in the IPO in accordance with NASD Rule 2310, the immediate backlash by those customers who were allocated such shares who did not understand their duties, who lacked the financial wherewithal to pay for such declining valued stock, or simply failed to perform in accordance with allocation Program was severe. So severe, in fact, that immediately following the IPO, financial news network CNBC initially reported, on May 24, 2006, that Vonage had issued a statement saying that it would ***not*** "alienate" its customers by demanding payment from those who refused to pay for their shares. At that time, the Company stated that it would repurchase any shares that were allocated to its customers but for which the Underwriter Defendants remained unpaid.

61. Not only did this statement serve to further reduce the price of Company shares, as investors calculated that the Company could now spend as much as $70 million of the $530 million it had just raised to purchase these unsold shares, but it alarmed investors who also calculated that this illegal and improper move would further violate federal and state securities laws, and further subject the Company to liability for the already botched IPO. There is no question among securities law experts that the creation of a separate class of stock, one that would immunize customers from IPO losses, would violate securities laws.

62. Thus, despite now facing massive defections by the same customers who were improperly allocated devalued Vonage IPO shares, the Company was now in the impossible position of having to collect from those customers who never should have been allocated Vonage shares, and who did not want to pay for them. By May 31, 2006, Vonage issued a statement

saying that it would now attempt to force its customers to pay for the shares allocated by Vonage to them. That day, Vonage spokesperson Schultz told MarketWatch that the Company would "reserve its right to pursue payment" for all shares improperly allocated to Vonage customers in connection with the IPO, through the Directed Share Program.

63.     By June 1, 2006, as defendants' statement regarding their intention to pursue Vonage customers for full payment of the Vonage shares allocated to them in the Offering circulated in the market, shares of the Company traded to a low of $11.52 per share before closing the day at $11.63 per share. At that time too, horror stories also began to surface, told by Directed Share Program participants who attempted to verify their allocations and/or protect or liquidate their positions.

64.     The first of these reports surfaced on May 24, 2006, immediately following the Offering. That day, FORBES.com reported, in part, the following:

> ***Retail investors who participated in the Vonage initial public offering Wednesday got snared by glitches that tripped up their ability to bail after the debut quickly turned into a flop***, with a 13% decline on the first day of trading.
>
> ***Adding insult to injury, these investors--as many as 300 of them at one of the three principal trading houses where they could make their transactions--were also Vonage customers.***
>
> Some of Vonage's 1.6 million subscribers were given a fairly unique opportunity to participate in the IPO through a Vonage program that would distribute some 4 million shares to subscribers who asked for them.
>
> All the subscribers had to do was set up a limited-purpose brokerage account at either Citigroup's Smith Barney, UBS or Deutsche Bank's Alex. Brown. The three banks were the main underwriters on the IPO.
>
> Vonage shares priced Tuesday night at $17, at the mid-range for the targeted price, and subscribers who signed up to participate in Vonage's "directed share program" were told Tuesday night how many shares they would be getting and how much they'd have to pay for them.

The shares opened flat in trading Wednesday and pretty quickly started to fall, down almost 5% by mid-morning. And when an IPO stock starts to fall, everyone wants to sell.

***But while the shares were falling, investors couldn't get through to their brokers to make a sell order. One investor said he sat on hold for 20 to 30 minutes, and even after getting through, he had difficulty executing a sell order. "It was like 1994,"*** said the investor (who requested anonymity), referring to that primitive time before ubiquitous Internet access.

***The self-described professional investor (aka day trader) says he was told by UBS that the Internet function set up for the Vonage program participants wasn't working***. He had initially requested an allocation of 3,000 shares and was given 800 shares, he said--and he lost about $800 by the time he got his sale executed Wednesday morning.

***He also said he couldn't get a quote on the stock or any information about it via the Internet***. At Smith Barney, information about Vonage's share price was also missing on the client Web site. No Smith Barney representative was available for comment.

***A UBS spokeswoman confirmed that technical problems on Wednesday affected some 10% of the 3,000 or so Vonage program participants the firm was working with***, though not all of the 300 had difficulty putting through sell orders, she said. "We are working with our systems people to satisfy the needs of our clients," she said.

***A Vonage spokesman would not comment*** on anything, citing the quiet period surrounding the IPO.  [Emphasis added.]

65.     Similarly, on May 30, 2006, TheStreet.com further reported, in part, that:

Last week's selloff taught one Vonage customer a lesson she won't soon forget.

***Nina Shreiber, a novice investor who has been a Vonage customer since 2004, tried to buy shares in the Holmdel, N.J.-based company's initial public offering.*** Vonage, saying much of its success has been "attributable to our customers," earlier this month allocated 15% of the IPO to users.

*     *     *

***Earlier this month, Shreiber says she requested 5,000 Vonage shares***, the most she could get.

***On the evening of May 23, when the IPO was priced, Shreiber says the Vonage IPO Web site reported that her purchase never went through.***

"In big, huge, bold letters it said I was allocated zero, and that I owed zero dollars," says Shreiber in an interview.

***The next day, though, Shreiber was surfing the Internet again and decided to take another peek at the IPO site. She was stunned to find out that the site now said she had been awarded 1,300 shares -- and owed $22,100.***

By then, Vonage shares had cratered more than 13% in the worst IPO debut since 2004. Now, Shreiber is working with her broker to get out of the transaction.

"In my mind, I don't own this stock," Shreiber says.

***A similar account is offered by Vonage customer David McFeeters-Krone. He says he didn't realize he had acquired shares until a statement came in the mail that he almost threw out in the trash.***

***"Anyway, I thought it was lame that their system screwed up and I probably held my shares a day or two longer than I would have otherwise, but hey I obligated myself to this process***," he writes in an email.

***Others say they had a difficult time selling them.***

***"After the stock tanked, it took me hours to find out how to sell my shares,***" writes Vonage customer Bob Moriarty in an email***. "I'm still trying to find out how to get my cash out of the account."*** [Emphasis added.]

66.     The market in which Vonage's common stock debuted was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Vonage common stock traded at artificially inflated prices at the time of the Offering.  Plaintiff and other members of the Class purchased or otherwise acquired Vonage common stocking upon the integrity of the market price of Vonage common stock and market information relating to Vonage, and have been damaged thereby.

67.     At the time of the Offering, defendants materially misled the investing public, thereby inflating the price of Vonage common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false

and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

68.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Vonage's IPO share allocation and Offering process. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vonage's IPO, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

69.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Vonage who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

70.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Vonage, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### COUNT I

### (Against All Defendants) For Violation of Section 11 of the Securities Act

71.     Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do ***not*** allege fraud, scienter or the intent of the defendants to defraud plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement and Prospectus.  This count is asserted by plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to or traceable to the false Registration Statement and Proxy Statement issued in connection with the May 2006 Offering.

72.     Vonage is the issuer of the stock issued via the false Registration Statement and Proxy-Prospectus.  As such, Vonage is strictly liable for each false and misleading statement contained therein.

73.     The Individual and Underwriter Defendants identified herein, *supra.*, are each signatories of the Registration Statement, therefore, each of these defendants had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Proxy-Prospectus to ensure that said statements were true, and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, defendants should have known of the material misstatements and omissions contained in the Registration Statement and Proxy-Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  As such, each of these defendants is liable to plaintiff and the Class.

74.     Each of the defendants identified in Count I issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Proxy-Prospectus which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct alleged herein, each defendant violated, and/or controlled a person who violated §11 of the Securities Act.  As a direct and proximate result of defendants' wrongful conduct, the price for the Vonage common stock sold in the May 2006 Offering was artificially inflated and plaintiff and the Class suffered substantial damages in connection with their purchase of Vonage common stock.

75.     Plaintiff and other members of the Class acquired their Vonage stock without knowledge of the untruths and/or omissions alleged herein.  Plaintiff and the other members of

the Class were thus damaged by defendants' misconduct and by the material misstatements and omissions of the aforementioned Proxy-Prospectus.

76.     This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the May 2006 Offering of Vonage common stock.

## COUNT II

### (Against Defendants Jeffrey A. Citron, Michael Snyder and Sharon A. O'Leary) For Violation of Section 15 of the Securities Act

77.     Plaintiff incorporates by reference each and every allegation contained above as if set forth herein. This Count is asserted against all Defendants.

78.     Throughout the Class Period, all Defendants acted as controlling persons of Vonage within the meaning of §15 of the Securities Act.  By reason of their stock ownership, senior management positions and/or directorships at the Company, as alleged above, these defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Vonage to engage in the unlawful acts and conduct complained of herein.

79.     By reason of such conduct, the defendants named in this Count are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of their wrongful conduct, plaintiffs and the Class suffered damages in connection with their acquisition of Vonage common stock.

## COUNT III

### Violation of Section 12(a)(2) of the Securities Act Against Vonage and Underwriter Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above.

81.     This Count is brought by plaintiff pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Vonage shares pursuant to the May 2006 Offering.  This cause of action is brought against all defendants.

82.     Defendants were sellers, offerors, and/or solicitors of sales of the Vonage shares offered pursuant to the Vonage Offering Registration Statement and Proxy-Prospectus.

83.     The Vonage IPO Registration Statement and Proxy-Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and Registration Statement.

84.     The defendants owed to the purchasers of Vonage shares which were sold in the May 2006 Offering the duty to make a reasonable and diligent investigation of the statements contained in the Proxy-Prospectus and Registration Statement, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials as set forth above.

85.     Plaintiff and other members of the Class purchased or otherwise acquired Vonage shares pursuant to and traceable to the defective Proxy-Prospectus.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

86.     Plaintiff, individually and representatively, hereby offer to tender to defendants those securities which plaintiff and other Class members continue to own, on behalf of all

members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

87.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, plaintiff and members of the Class who hold Vonage shares purchased in the May 2006 Offering have the right to rescind and recover the consideration paid for their Vonage shares and, hereby elect to rescind and tender their Vonage shares to the defendants sued herein.  Plaintiff and Class members who have sold their Vonage shares are entitled to rescissory damages.

88.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

COHEN, PLACITELLA & ROTH,
A Professional Corporation

Dated:  June 2, 2006            By:    _____
                                       CHRISTOPHER M. PLASCITELLA (5715)
                                       115 Maple Avenue
                                       Red Bank, NJ 07701
                                       Phone:  (732) 747-9003
                                       Fax:  (732) 747-9004
                                       Email:  cplacitella@cprlaw.com

                                       **MOTLEY RICE LLC**
                                       Stuart J. Guber
                                       Lauren S. Antonino
                                       James E. Evangelista
                                       600 West Peachtree St.
                                       Suite 800
                                       Atlanta, GA 30328
                                       Telephone: (404) 201-6900
                                       Facsimile:  (404) 201-6959
                                       lantonino@motleyrice.com

                                       **SAXENA WHITE P.A**
                                       Maya Saxena
                                       5200 Town Center Circle, Suite 600
                                       Boca Raton, Florida 33486
                                       Tel: (954) 701-3965
                                       Fax: (888) 782-3081

msaxena@saxenawhite.com

**KAHN GAUTHIER SWICK, LLC**
Michael A. Swick
Lewis Kahn
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff**